IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| ERIC JASON WATSON, | ) | |
| | ) | |
| Plaintiff, | ) | 2:24-cv-00630 |
| | ) | |
| v. | ) | |
| | ) | |
| CODY REESE, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION

**Mark R. Hornak, Chief United States District Judge**

Eric Watson filed this action, acting *pro se*, alleging civil rights violations arising from a police interaction in a public building he entered in downtown Beaver Falls, Pennsylvania. After initially reviewing his *pro se* Complaint under 28 U.S.C. § 1915(e)(2), the Court dismissed that Complaint with leave to amend. (ECF No. 4). Mr. Watson amended his Complaint once and then paid the filing fee. (ECF Nos. 9, 12). He then moved to file a Second Amended Complaint. (ECF No. 24). The Court granted that motion, and the Second Amended Complaint ("SAC") was docketed. (ECF Nos. 29, 31). All Defendants now move to dismiss the SAC in its entirety, (ECF No. 32), which Mr. Watson opposes. (ECF No. 34). Mr. Watson later sought to supplement his Response to the Motion to Dismiss, (ECF No. 44). The Court examined that Motion to Supplement, and determined that in reality, he was seeking to further amend his Second Amended Complaint, so it denied his Motion to Supplement his Response, but allowed him yet another opportunity amend his Second Amended Complaint. (ECF No. 45). The time allotted for him to

1

do so has come and gone, with no further amendment. Thus, the SAC is the operative pleading before the Court.

For the following reasons, the Court will GRANT the Motion to Dismiss. Because the Court had advised Mr. Watson in its prior Order that, given the multiple amendatory opportunities he has been provided, he should assume that the Court's past permission to amend would likely be his final chance to correct the defects alleged by Defendants in their prior Motion to Dismiss, (ECF No. 29), and because the Court concludes that further efforts to amend the Complaint would be futile, the dismissed claims and therefore this civil action will be DISMISSED WITH PREJUDICE.

## I.    Factual Background[1]

The facts are taken from the operative pleading, the Second Amended Complaint. Mr. Watson is a resident of Beaver County (PA) who reported alleged violations of Pennsylvania regulations on case management by Beaver County Behavioral Health, a division of Beaver County Human Services ("BCHS"), which is an element of the local government in Beaver County. BCHS did not look into the violations that Mr. Watson reported in the way that he believed was necessary, so he then contacted the Beaver County Commissioners' office. When those officials failed to respond adequately (in his view) to his complaints, he filed a formal complaint

---

[1] All facts are taken from the SAC (ECF No. 31). Mr. Watson's later-filed Motion for Default Judgment, which appeared to be properly construed as a Motion for Sanctions, described "factual disputes" that have allegedly arisen "[w]ith the filing of Defendant's Motion to Dismiss." (ECF No. 35-1, at 6). As described in Section II *infra*, all well-pled facts in the SAC are taken as true. To the extent the Motion to Dismiss construes those facts differently, the version in the SAC is accepted as true at this stage of the litigation. *See McTernan v. City of York*, 564 F.3d 636, 646 (3d Cir. 2009). As noted above, Mr. Watson also sought to supplement his Response to the Motion to Dismiss (ECF No. 44), but as the Court noted in its Order at ECF No. 45, his effort appeared to be aimed at impermissibly amending his SAC via a supplemental brief. Nonetheless, the Court gave Mr. Watson an additional period of time to further amend his SAC via the Order at ECF No. 45, which Mr. Watson did not do, and the time for his doing so has expired.

with Beacon Health Options.[2] That organization conducted a review of the situation and found information supporting Mr. Watson's complaints to the Commissioners. Seemingly unsatisfied with having been proven right, Mr. Watson next attempted to follow up with BCHS via phone, apparently to inform them of the success of his formal complaint and to then interrogate them as to why their response to him had been insufficient in the first place. He was again dissatisfied with their telephonic response and decided to go to the BCHS building in person for those same purposes.

When Mr. Watson arrived at the BCHS building on August 23, 2022, he was directed to a conference room where he met with a BCHS employee. Dissatisfied with the employee's answers to his questions about why he had been right and the Behavioral Services wrong and why it had processed his prior complaints in the way that it did, he returned to the reception desk and requested to speak with someone else in that public office.

The administrative assistant questioned his need to pursue his inquiries further given the information that the BCHS employee had already made available to him and the fact of the prior decision essentially in his favor and that had been issued as to his formal complaint. During his conversation with the person at the front desk, which Mr. Watson says was calm and civil, two Sheriff's Deputies from the Beaver County Sheriff's Office arrived. They said they were responding to reports of a disturbance in the office and asked the BCHS employees if they wanted Mr. Watson removed from the office. Mr. Watson says he was not asked to leave prior to the deputies' arrival.

---

[2] The role of Beacon Health Options relative to Beaver County Behavioral Health is not clear from the SAC.

When the deputies did ask him to leave, however, he says that he did so "without incident," with one apparent and rather significant self-admitted exception, that is, his calling the public employee whom he believed had called the deputies a "fucking asshole." (ECF No. 31 at 7).

In the building elevator on the way out of the building, Mr. Watson says that he asked if he was trespassing and was allegedly told he was not, but that he needed to leave BCHS for the day. Because Mr. Watson was done with his business with the office, he claims that he left and did not object to what had occurred. The SAC does not reveal that Mr. Watson was in the building to conduct any public business with the office, other than his desire to point out to the officials of BCHS that he had been "right" in his complaints to the Commissioners (and beyond) as to matters which had already been resolved by the time of his visit to the office.

Mr. Watson asserts that the deputies filed an incident report, which noted that no further action by the deputies was needed or taken, and no charges were brought against Mr. Watson. The report also noted that Mr. Watson would be permitted to enter the BCHS building only if he was escorted while present in the building or was seeking crisis services (for which he could enter the building without limitation or escort for such purposes). They requested Mr. Watson's photo from the Pennsylvania Department of Transportation to help implement this process. Mr. Watson says he was not informed or aware of the fact that he would only be permitted to enter the BCHS building on those terms after this incident.

On August 26, 2022, Mr. Watson returned to the vicinity of the building in downtown Beaver Falls, he says so that he could take photographs of historic buildings in the area. He says his photographs have been previously used for news stories, by local park services, and in music release artwork. Mr. Watson also says that his conduct in taking photos that day was expressive—

not by making photographic art, but instead that by his being where he was taking photos, he was trying to express to others that it is his right to be in, and take photographs of, public places.

A local probation officer, Ken Stahl, was apparently in the area and arrived at the same parking lot where Mr. Watson says that he was taking photographs and asked Mr. Watson what he was doing. Mr. Watson said he advised that he was not doing anything wrong, that he was not breaking any laws, and walked away. Mr. Watson alleges that Mr. Stahl followed, and that Mr. Watson asked Mr. Stahl to stop following him. Mr. Watson then entered the BCHS building to ask the on-duty Sheriff's Deputy, Cody Reese, to stop Mr. Stahl from following him (Mr. Watson) while he and Mr. Stahl were outside of the BCHS building. Apparently at the same time, Mr. Stahl called the local police department. Mr. Watson alleges that Mr. Stahl said that he did so to report Mr. Watson taking photographs of parked cars. Both Mr. Reese and Mr. Stahl instructed Mr. Watson to remain in the lobby of the building with them until the local police arrived. Mr. Watson says that Stahl and Reese asked him questions, to which Mr. Watson elected not to respond, apparently without consequence. Officers of the Beaver Falls Police Department then arrived, and Mr. Stahl and Mr. Reese departed. But Mr. Watson was then arrested and charged with public intoxication by the local police. He proceeded to trial on that charge and was found not guilty.

Mr. Watson protests that (1) he was never told he could enter the BCHS building only if escorted in the building or to seek crisis services after the initial incident, or how long such restrictions would be in place; (2) he was never told he was trespassing; (3) he was given no opportunity to oppose the limitations on building access or told how to get them removed; (4) assuming he was, in fact, permitted to access the building for purposes other than crisis services with limitations, he was following the exact procedure someone who was seeking crisis services would follow; and (5) Defendants were retaliating against him for exercising his First Amendment

rights to address the government and to engage in photography. He subsequently filed a series of state law Right-to-Know requests, without success, and says that Beaver County's lack of a proper record retention policy is representative of their overall failure to enact appropriate government policies in general. That failure, he says, was a direct contributor to his alleged injuries in this case.

Mr. Watson now brings claims alleging violations of his rights under the First and Fourth Amendments, a due process claim that he alleges under the Fourth Amendment, a municipal liability claim, and claims arising under Pennsylvania tort law.

## II.    Standard of Review

The Defendants move to dismiss because Mr. Watson has allegedly failed to state a claim under Federal Rule of Civil Procedure 12(b)(6). In determining if Mr. Watson has stated a claim, the question is whether he has "made factual allegations that state a plausible ground for relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009). A plaintiff need not show that they will probably prove the claim but must make enough plausible factual allegations to raise a reasonable expectation that discovery will reveal evidence of the necessary elements. *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008). "A complaint may not be dismissed merely because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits." *McTernan*, 564 F.3d at 646.

The Court must therefore "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips*, 515 F.3d at 233. Relevant here, a complaint filed by a pro se litigant is "liberally construed, but must still 'allege sufficient facts . . . to support a claim.'" *Rivera v. Monko*, 37 F.4th 909, 914 (3d Cir. 2022) (alteration in original)

(quoting *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 245 (3d Cir. 2013)). Importantly, "unsupported legal conclusions asserted in complaints" are not treated as "well-pled factual allegations" that the Court must accept as true. *Gov't Emps. Ins. Co. v. Mount Prospect Chiropractic Ctr.*, 98 F.4th 463, 470 (3d Cir. 2024). The question is ultimately whether a plaintiff has alleged sufficient plausible factual material—beyond conclusory legal statements—to create a "reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## III.    Legal Analysis

As a preliminary matter, Mr. Watson brought a previous suit based on apparently the same incident, or at least one with significant factual overlap, before this Court that has since been resolved and dismissed by Order. *Watson v. Applegarth*, No. 2:23-cv-1725 (W.D. Pa. June 25, 2024). It occurs to the Court that his claims here may therefore be barred in whole or in part under a claim preclusion doctrine, also called *res judicata*, which bars repeated litigation of the same claims. *See Lucky Brand Dungarees, Inc. v. Marcel Fashion Grp., Inc.*, 590 U.S. 405, 412 (2020). Claim preclusion applies when there has been a final judgment on the merits in a prior suit, a subsequent suit based on the same cause of action and involvement of the same parties or those in privity with the prior parties. *Ndungu v. Att'y Gen. United States*, 126 F.4th 150, 165 (3d Cir. 2025). *Res judicata* "prohibits reexamination not only of matters actually decided in the prior case, but also those that the parties might have, but did not assert in that action." *Edmundson v. Borough of Kennett Square*, 4 F.3d 186, 189 (3d Cir. 1993). Thus, even though Mr. Watson asserts slightly different claims here, against several different defendants, claim preclusion may apply because the

claims here arise from the same "common nucleus of operative facts." *Lucky Brand*, 590 U.S. at 412 (quoting Restatement (Second) of Judgments § 24 cmt. b (1982)).

Claim preclusion, however, is an affirmative defense for which a defendant bears the burden of proof. *Taylor v. Sturgell*, 553 U.S 880, 907 (2008). A defendant may raise claim preclusion on a motion to dismiss, but the "party seeking to take advantage of claim preclusion has the burden of establishing it." *Toscano v. Conn. Gen. Life Ins. Co.*, 288 F. App'x 36, 38 (3d Cir. 2008) (quoting *Gen. Elec. Co. v. Deutz AG*, 270 F.3d 144, 158 (3d Cir. 2001)). Because Defendants do not raise the defense of claim preclusion here, the Court will not evaluate Mr. Watson's claims relative to the Motion to Dismiss on that basis. The Court therefore addresses Mr. Watson's claims and the efforts to dismiss them individually in the context of the Motion to Dismiss as filed.

### a. Fourth Amendment Claim (Count I)

Watson first claims that Defendants Reese and Stahl unreasonably seized him in violation of his Fourth Amendment rights by detaining him while they all waited for the Beaver County police to arrive when Watson had entered the BCHS office building seeking law enforcement assistance because he claimed Stahl was following him around outside of the building. In moving to dismiss this claim, those two Defendants say first that Stahl is a probation officer without authority to act under color of state law to detain Mr. Watson, and second, that to the extent Mr. Watson was detained at all, it was based on reasonable suspicion that he was violating Pennsylvania's defiant trespass statute. Mr. Watson says that "trespassing" was never mentioned to him, that he was unaware of the restrictions on his entry into the BCHS building, that the building was otherwise open to the public, and that the only charge filed against him was for public intoxication, not trespassing.

The Fourth Amendment protects against unreasonable searches and seizures. U.S. Const. amend. IV. While a warrant is generally required for a search or seizure to be reasonable, *United States v. Robertson*, 305 F.3d 164, 167 (3d Cir. 2002), "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot," *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). Reasonable suspicion is a less demanding standard than probable cause, but there must be specific, articulable facts available to the officer making a stop, beyond a generalized intuition. *United States v. Amos*, 88 F.4th 446, 451 (3d Cir. 2023) (citing *Wardlow*, 528 U.S. at 123-24). Any investigatory stop must be "reasonably related in scope to the circumstances which justified the interference in the first place." *United States v. Sharpe*, 470 U.S. 675, 683 (1985).

Here, Watson was allegedly detained at the BCHS building for a few minutes until the local police arrived;[3] there was no search of his person or physical contact with him and no further intrusion on his person, and this interaction even in Watson's telling lasted only a few minutes. Under Pennsylvania law, a person commits defiant trespass when "knowing that he is not licensed or privileged to do so, he enters or remains in any place as to which notice against trespass is given by," among other methods, "an actual communication to the actor to leave school grounds as

---

[3] Defendants do not affirmatively contest whether Watson was seized for purposes of their Motion when he was allegedly detained and subsequently arrested for public intoxication. But the Court has its doubts on the facts that Watson asserts. Mere "exchanges 'involving no coercion or detention'" are not seizures and do not implicate the Fourth Amendment. *Perez v. Borough of Johnsonburg*, 74 F.4th 129, 134 (3d Cir. 2023) (quoting *United States v. Brown*, 765 F.3d 278, 288 (3d Cir. 2014)). At the same time, there is precedent for the conclusion that when a law enforcement officer "restrains the citizen's liberty" with an assertion of legal authority, and the citizen submits to that assertion, the officer has seized the person. *Id.* Watson alleges that he was not free to leave because Reese and Stahl told him he had to wait for the police to arrive. (ECF No. 31, at ¶¶ 53-54). It is unclear to the Court that this was an actual assertion of lawful authority in light of the fact that Mr. Watson had come into the building in the first place to seek law enforcement assistance relative to his concerns that he was being followed by Stahl. So it strikes the Court that being asked to await the arrival of law enforcement in those circumstances was not a seizure at all, but honoring his request for assistance. For these purposes and in the context of the Motion to Dismiss, the Court will treat this interaction as including a "seizure" and evaluate whether there was reasonable suspicion to support it. *See United States v. Smith*, 575 F.3d 308, 314 (3d Cir. 2009).

9

communicated by a school, center or program official, employee or agent or a law enforcement officer." 18 Pa. Cons. Stat. § 3503(b)(1). Based on Mr. Watson's previous interaction with BCHS, when he was specifically asked to leave the office by law enforcement in an episode where he admittedly called the public employee on duty and whom he had been dealing with a "fucking asshole", as well as the totality of the circumstances involved in his brief alleged detention, it was plainly reasonable for a law enforcement officer to detain him until the police (who had already been called to the scene) could ascertain the actual reason for Watson's presence in the building.[4] And by Mr. Watson's own admissions in the SAC, when he had previously come to the office and was asked to leave, it was not to receive public services or to engage in other public business, but to in effect point out to whatever staff he encountered that as to his prior complaints to the Commissioners, he had been right and they had been wrong. Considering all of the circumstances as Mr. Watson himself lays them out in the SAC, even if Mr. Watson's conduct ultimately did not actually meet the statutory definition of defiant trespass into the office space involved: there was sufficient reason to believe that he had done so such that the police could permissibly detain him so long as the seizure was reasonable in scope and duration relative to the alleged unlawful activity.

Watson protests that he could not have been detained for trespassing: no one told him he was detained for trespassing specifically, and his ultimate arrest was for public intoxication and not trespassing. Even if he did not have notice that he was not permitted onto the premises for general purposes unrelated to "crisis intervention" services for which he admits he was permitted in the building, such that he could be found guilty beyond a reasonable doubt of defiant trespass,

---

[4] At some point, an investigatory stop can ripen into an arrest and must be supported by probable cause. *United States v. Wrensford*, 866 F.3d 76, 85-88 (3d Cir. 2017). Mr. Watson was formally arrested for public drunkenness after the stop. While he was ultimately found not guilty of that charge, there are no allegations, beyond Watson's conclusory assertions that the arrest was unlawful, that would indicate the arrest and prosecution for public intoxication were not supported by probable cause and reasonable law enforcement actions. And Mr. Watson does not bring any claim against the police officers or agency that arrested him on that charge.

for the reasons noted above, his brief detention by being asked to not leave the building lobby was otherwise permissible. His SAC does not aver that Reese or Stahl, or the responding local police, knew that Mr. Watson had not been told of any "rules of the road" for his entry to the building. And even if the police have a specific, articulable reason to believe that unlawful activity is occurring, their subjective intentions in conducting a stop or seizure need not be the same as the objective reasons for doing so. *Whren v. United States*, 517 U.S. 806, 810 (1996); *see United States v. Delfin-Colina*, 464 F.3d 392, 399-400 (3d Cir. 2006) (applying *Whren* to *Terry*-stop standard). To pass constitutional muster, police need only identify the ordinance or statute that they believe had been violated and provide facts that support "an objective determination of whether any officer could have possessed reasonable suspicion of the alleged infraction." *Delfin-Colina*, 464 F.3d at 399. Here, there were sufficient articulable facts to support an objectively reasonable belief that Mr. Watson was trespassing, and apparently being publicly intoxicated in light of his arrest that day (an arrest he does not challenge or otherwise call into question in this civil action).

It is important to recall that Mr. Watson pleads that he elected to enter the BCHS building during these events in the first instance, and to initiate the interaction with the on-duty Deputy Sheriff. When he did so, he asked for law enforcement action against Stahl because Stahl was allegedly following him on a public street, was told that the local police had been called, and was asked to remain in the lobby pending their arrival. The SAC does not allege that Watson was physically restrained, or that he was threatened with any penalty if he did not remain in the building pending the arrival of the local police, an event consistent with his own request for law enforcement engagement when he entered the building in the first place. Further, there is no assertion by Mr. Watson that he entered the building to seek some sort of crisis intervention or treatment, so any actions taken could not be seen as interfering with such public services. Thus, to

the extent Mr. Watson was considered detained at all, the officers involved used no force and only asked him to wait for the arrival of local police to sort out the very situation Mr. Watson had sought law enforcement support for when he entered the building. That level of intervention was entirely proportional to Watson's conduct in entering the building and within Constitutional boundaries in these circumstances.

To the extent he was detained at all, Mr. Watson's detention was sufficiently brief so as to be lawful in the circumstances and based on reasonable suspicion that he was acting contrary to state law coupled with the reality that it was reasonable considering the totality of the circumstances. Thus, he has no Fourth Amendment claim actionable under § 1983, and Count I is DISMISSED.

### b. *First Amendment Claim (Count II)*

Mr. Watson says that Stahl following him in a public place, and Stahl and Reese subsequently detaining him in the office lobby, was a violation of his First Amendment right to take photographs in public when his doing so was intended to communicate to others that he was allowed to do so. Defendants move to dismiss on the basis that this is not First Amendment–protected conduct. To plead a First Amendment retaliation claim actionable under § 1983, a plaintiff must allege that they engaged in protected activity and that the protected activity was a substantial factor in subsequent government retaliation. *Hill v. Borough of Kutztown*, 455 F.3d 225, 241 (3d Cir. 2006).

"The First Amendment protects actual photos, videos, and recordings, and for this protection to have meaning the Amendment must also protect the act of creating that material." *Fields v. City of Philadelphia*, 862 F.3d 353, 358 (3d Cir. 2017) (internal citation omitted). But "not . . . all recording is protected or desirable." *Id* at 360. *Fields* dealt specifically with the right

to record police activity, and the Third Circuit emphasized "the public's right of access to information about their officials' public activities." *Id.* at 359. There are no such important rights of information access or preservation at issue here. And even when the right to information is at issue, governments may enact reasonable time, place, and manner restrictions, such as preventing recording that interferes with legitimate government activity. *Id.* at 360 (citing *Kelly v. Borough of Carlisle*, 622 F.3d 248, 262 (3d Cir. 2010)).

In certain circumstances, "photography or videography that has a communicative or expressive purpose enjoys some First Amendment protection." *Gilles v. Davis*, 427 F.3d 197, 212 n.14 (3d Cir. 2005). Mr. Watson says that his conduct in taking outdoor photos of buildings was actually his expressing the message that he had a First Amendment right to take those photographs. Thus, notwithstanding the seemingly circular nature of that argument, he seems to allege a two-level deep type of protected conduct: not that he was engaged in protected conduct by taking those photos, but instead that by taking the photos, he was transmitting the distinct message that he was allowed to take the photos.

The Court harbors substantial doubt as to whether his conduct as he describes it plausibly communicates this attenuated and somewhat circular message, as required for it to be protected as expressive conduct. *See Pomykacz v. Borough of West Wildwood*, 438 F. Supp. 2d 504, 513 n.14 (D.N.J. 2006) ("An argument can be made that the act of photographing, in the abstract, is not sufficiently expressive or communicative and therefore not within the scope of First Amendment protection . . . .") (citing *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 160 (3d Cir. 2002)). But, because "the value of the recordings may not be immediately obvious," *Fields*, 862 F.3d at 358, any expressive or otherwise protected intent related to Mr. Watson's act of taking photographs need not have been fully formed at the outset for the act of creation to be generally

protected. And it strikes the Court that it is more than a bit of a stretch to conclude from Mr. Watson's description of his conduct that any reasonable observer would conclude that he was communicating the particular message he now pleads via his conduct.

But even if the Court assumes his conduct was protected because it was communicating a message that the very act of engaging in the conduct was constitutionally protected, Mr. Watson must also allege that the County's alleged harassment and arrest were caused by his photographic activity. *Hill*, 455 F.3d at 241 (citing *Curinga v. City of Clairton*, 357 F.3d 305, 310 (3d Cir. 2004)). Mr. Watson must "proffer evidence sufficient to raise the inference that [his] engagement in a protected activity was the *likely reason* for the adverse . . . action." *Carvalho-Grevious v. Del. St. Univ.*, 851 F.3d 249, 253 (3d Cir. 2017) (emphasis in original); *see Oliver v. Roquet*, 858 F.3d 180, 195 (3d Cir. 2017) (citing *Carvalho-Grevious* in First Amendment context). In many cases, temporal proximity can be sufficient to show a causal connection, especially when the two events are so close together as to be "unusually suggestive of a retaliatory motive." *Estate of Smith v. Marasco*, 318 F.3d 497, 512 (3d Cir. 2003). But "the quintessential 'factual issue' of causation" is whether the allegedly retaliatory action would have occurred absent the possibly protected conduct. *Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 761 (3d Cir. 2019) (quoting *Green v. Phila. Hous. Auth.*, 105 F.3d 882, 889 (3d Cir. 1997)).

Here, in the Court's view, Mr. Watson does not plausibly allege that his brief detention and subsequent arrest for public intoxication (by the local police, who are not Defendants in this action) were in retaliation for First Amendment–protected activity as he defines it. Even assuming his on-street photographic activity was protected by the First Amendment, what induced the local police to arrest him per his pleadings was his deportment and physical condition assessed after his entrance into the BCHS building, a decision that he himself made. A person peacefully following

14

Mr. Watson and asking him questions, on a public street in daylight, with no actual or implicit threat involved, simply is not retaliatory. Nor is there any matter pled that Stahl's actions were at all motivated by Mr. Watson taking photos in a public space *for the purpose of communicating that he was permitted to take photos in a public space.*

Watson's previous actions toward BCHS employees in the BCHS building—including, by his own admission, launching a double expletive at a public employee who had been serving him—directly undercuts Mr. Watson's contention that any of the police action he alleges once he decided to enter the building here was inherently retaliatory. Instead, Watson had been escorted out of the building after past encounters with public employees, then entered the building again anyway on the day in question for the purpose of engaging with law enforcement. This does not plausibly tie into any retaliation for his asserted picture taking activities, and the SAC makes that connection only in a conclusory fashion. And the same goes for his subsequent arrest by the local police for public intoxication, which occurred after Stahl and Deputy Reese had left the lobby. Based on the SAC, these actions would have occurred whether or not he was taking photographs outside the BCHS building prior to his entrance, and therefore the photographing activity is not plausibly pled as a but-for cause of any subsequent police conduct.

Therefore, Mr. Watson does not plausibly allege facts giving rise to a First Amendment claim and Count II is DISMISSED.

    *c. Due Process (Count III)*

Mr. Watson alleges that Defendants deprived him of his due process rights.[5] It is not entirely clear whether Mr. Watson disputes the initial decision to set terms of the mode by which

---

[5] Mr. Watson also says that Beaver County denied him access to evidence in the related criminal case, but there are no factual allegations in the SAC on this point, so there is nothing plausibly pled as to that allegation.

he could traverse the BCHS building, save from crisis services or without an escort, or whether he disputes his detention on August 26 specifically. To the extent he seeks to litigate the propriety of his detention on August 26, that is a Fourth Amendment claim, discussed and resolved above. Fourteenth Amendment procedural due process, however, may be a viable claim to the extent Watson disputes limitations on the means of his presence in the BCHS building without an opportunity to be heard in advance.[6] *See Jarbough v. Att'y Gen. United States*, 483 F.3d 184, 190 (3d Cir. 2007) ("At the core of due process are the requirements of notice and a meaningful opportunity to be heard.").

To state a procedural due process claim, "a plaintiff must allege that (1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of life, liberty, or property, and (2) the procedures available to him did not provide due process of law." *Hill*, 455 F.3d at 233-34. The first question for assessing Mr. Watson's claim, then, is whether he has alleged facts which demonstrate that he has a fundamental liberty interest in accessing the BCHS building other than on the terms he pleads, and thus that his right to do so receives Fourteenth Amendment protection.

A liberty interest protected by procedural due process "may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' or it may arise form an expectation or interest created by state laws or policies." *Steele v. Cicchi*, 855 F.3d 494, 507 (3d Cir. 2017) (quoting *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005)). But there is not a protected liberty interest in unfettered access to government buildings. *See Zomerfeld v. Kingston Twp. Police*, 2023 WL 2657637, at *9 (M.D. Pa. Feb. 9, 2023) ("But [plaintiff] simply has no protected interest in

---

[6] The SAC alleges "Fourth Amendment due process violations," but also refers to the Fourteenth Amendment. Because other portions of the SAC refer to Fourteenth Amendment violations, and because there is no right referred to as "due process" under the Fourth Amendment, the Court will evaluate this claim solely under the Fourteenth Amendment.

accessing these municipal properties.") (collecting cases); *see also Cole v. Montague Bd. of Educ.*, 145 F. App'x 760, 762-63 (3d Cir. 2005) (no due process violation for ban from school property without a hearing). As anyone who has tried to access a "no public access" section of a Post Office knows, reasonable restrictions on the means of access to government buildings is neither surprising nor facially impermissible. And even under Mr. Watson's account of the facts, any restrictions (if they were restrictions at all) on his ability to access the BCHS building were reasonable as a matter of law.

Let's look at the facts as alleged. Mr. Watson, based on his own pleading, had on his prior visit to the building come for the purpose of telling the public employees that he was correct about his prior complaint to the County leadership, a visit that included upon his exit his gratuitously referring to the public employee he previously encountered as a "fucking asshole." Further, there was no limitation placed on his entering the building for its public business purposes, namely to receive crisis counseling services. And, he was otherwise permitted in the building without any limitation on his conduct of business, so long as he was escorted. Considered as a whole, the circumstances generated by his prior visit and interaction with public employees as pled by him in the SAC support the requirement for entry that he either be escorted or that he enter the building for the purpose of accessing the public services provided there, e.g. that he be "in crisis". Ultimately, Mr. Watson was permitted to enter the building: he could do so without an escort if he needed crisis services and could do so in other circumstances if he had an escort. Thus, there was no limitation placed on his entering the building to access the public "crisis services" provided there, and no limitation on his doing otherwise so long as he had an escort, a requirement that would be eminently reasonable given his admitted vulgar encounter with the staff in that building.

In short, as a matter of law, the limitations he challenges are either not limitations at all, or do not impair any legitimate interest he'd have for being present in the building in question.

Defendants were not required to provide Mr. Watson advance notice and right to be heard on the terms under which he could enter the building in these circumstances and Count III is therefore DISMISSED.

### d. *Municipal Liability (Count IV)*

To state a municipal liability claim, a plaintiff may not merely allege that the municipality employed a tortfeasor. Instead, municipal liability attaches only when "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). A plaintiff must identify the allegedly unlawful policy or custom that was the cause of their injury. *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juv. Det. Ctr.*, 372 F.3d 572, 580 (3d Cir. 2004).

Mr. Watson says that Beaver County's failure to enact a record retention policy "and their additional lack of policies regarding the actions that were taken against the Plaintiff" were a direct cause of the alleged constitutional violations. (ECF No. 31, at ¶ 78). Among these allegations, the only specific policy or lack thereof he cites is the failure to implement a records retention policy; the general allegation that a municipality has a policy that violates a person's rights is insufficient without more specific details of the alleged policy and how that policy deprives them of a federally recognized right. *See McTernan*, 564 F.3d at 658 ("To satisfy the pleading standard, [plaintiff] must identify a custom or policy, and specify what exactly that custom or policy was."). Mr. Watson does not specify how a "records retention" policy would conceivably have anything to do with the events at issue here, and his generalized complaint that the County had inadequate formal

governmental policies across the board is simply insufficient to make out the Constitutional claims that he seeks to assert.

"In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). But a municipality must generally be "on notice that, by failing to act, it was being deliberately indifferent" to the possibility that constitutional violations would occur. *Hightower v. City of Philadelphia*, 130 F.4th 352, 357 (3d Cir. 2025). Mr. Watson does not allege facts that would indicate Beaver County was aware of a pattern of similar alleged violations. Any risk that members of the public would have any substantial rights violated if their access to a public building was restricted after calling an employee the highly vulgar phrase used by Mr. Watson was not so patently obvious that such a pattern would not be necessary to show a deliberate or conscious policy choice by local government. *See City of Canton v. Harris*, 489 U.S. 378, 390 n.10 (1989) ("It could also be that the police, in exercising their discretion, so often violate constitutional rights that the need for further training must have been plainly obvious to the city policymakers, who, nevertheless, are 'deliberately indifferent' to the need.").

Even if the Court were to assume that Beaver County failed to enact certain such policies despite being on notice of the risks, Mr. Watson's claim would fail. Broadly alleging the existence of a policy, or more precisely here a deliberate indifference to the necessity of enacting a records retention policy, is insufficient to survive a motion to dismiss: a plaintiff must also show that the policy (or the failure to enact it) was the proximate cause of their Constitutional injury. *Est of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019). Any failure to enact a records retention policy is too distantly attenuated and causally removed from detaining Mr. Watson or restraining

his ability to take outdoor photographs in public spaces of a historic building that it cannot support the claim he seeks to assert. And Mr. Watson has not alleged actual plausible facts —beyond conclusory statements—that would demonstrate any "'affirmative link' between the policy or custom and the particular constitutional violation he alleges." *Id.* (quoting *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990)). This claim is therefore DISMISSED.

   *e.   State Law Tort Claims (Count V)*

   Mr. Watson also brings claims for false imprisonment and intentional infliction of emotional distress ("IIED") under state law against Mr. Reese and Mr. Stahl. Those Defendants move to dismiss those claims as barred by the Pennsylvania Political Subdivision Tort Claims Act ("PSTCA"). The PSTCA protects government actors from tort immunity unless their actions constitute "willful misconduct." 42 Pa. Const. Stat. § 8550; *see* §§ 8541 (governmental liability), 8545 (official liability). Mr. Watson says that these Defendants are not immune because their actions constitute willful misconduct.

   In the context of tort law, "'willful misconduct' is synonymous with the term 'intentional tort.'" *King v. Breach*, 540 A.2d 976, 981 (Pa. Commonw. Ct. 1988). To the extent Mr. Watson alleges facts that would establish the requisite intent for the intentional tort of IIED, then, Stahl and Reese would not benefit from PSTCA immunity. False imprisonment and willful misconduct, however, are not coextensive under Pennsylvania law. *Renk v. City of Pittsburgh*, 641 A.2d 289, 293-94 (Pa. 1994). Mr. Watson must therefore specifically allege that Mr. Reese and Mr. Stahl were "at least . . . aware that it was substantially certain" that their actions met the definition of false imprisonment. *King*, 540 A.2d at 981. He does not make those allegations, and Reese and Stahl are therefore immune from false imprisonment tort claims under the PSTCA.

Regardless, however, the Court cannot conclude that the allegations in the SAC meet the substantive requirements to plead *either* false imprisonment or intentional infliction of emotional distress. False imprisonment requires Mr. Watson to show that he was (1) detained, and (2) that the detention was unlawful. *Renk*, 641 A.2d at 293. Mr. Watson does not allege facts from which it could plausibly be concluded that his detention was unlawful—while he was not found guilty of the charge of public drunkenness against him at trial, that does not mean there was no probable cause for his arrest on that charge. "An arrest based on probable cause would be justified, regardless of whether the individual arrested was guilty or not." *Renk*, 641 A.2d at 293 (citing *Fagan v. Pittsburgh Terminal Coal Corp.*, 149 A. 159 (Pa. 1930)). And Mr. Watson does not bring any claim against the officers that actually arrested him. Thus, Watson's factual allegations cannot support a false imprisonment claim.

Intentional infliction of emotional distress requires conduct that is "so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Rineheimer v. Luzerne Cnty. Cmty. Coll.*, 539 A.2d 1298, 1305 (Pa. Super. Ct. 1988). Because "the definition of 'outrageousness' is subjective and nebulous . . . objective proof of an injury is required." *Gray v. Huntzinger*, 147 A.3d 924, 927-28 (Pa. Super. Ct. 2016) (requiring medical evidence for recovery on an IIED claim). None of the conduct described by Mr. Watson, even broadly construed, reaches that high bar, let alone surmounts it. Nor does he allege any concrete and objective injury he sustained as a result. His allegations therefore cannot support an IIED claim either. Count V is therefore DISMISSED.

**IV.    Conclusion**

The Court assumes all non-conclusory factual allegations in the Second Amended Complaint are true. Even on that assumption, however, the plausible facts pled in Mr. Watsons SAC would not give rise to liability for the claims he alleges. The Motion to Dismiss is therefore GRANTED. Because Mr. Watson has previously sought and been granted leave to amend, and this is his third iteration of his complaint in this Court, and he was given yet another prior opportunity to amend which he did not take, (ECF No. 45), and the Court concludes further amendment would be futile, all claims are DISMISSED WITH PREJUDICE.

An appropriate Order will enter, and the Clerk shall close the case on the docket.


/s/ Mark R. Hornak
Mark R. Hornak
Chief United States District Judge

Dated:  September 25, 2025